# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2233-18
              A-3932-18
              A-1982-19

A.K.S.,[1]

       Plaintiff-Appellant,

v.

M.V.M.,

       Defendant-Respondent.

_____

Agued January 26, 2021 – Decided March 3, 2021

Before Judges Yannotti, Haas, and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FM-09-0124-17.

Matheu D. Nunn argued the cause for appellant in A-2233-18 and Jessie M. Mills argued the cause for appellant in A-3932-18 (Einhorn, Harris, Ascher, Barbarito & Frost, PC, attorneys; Matheu D. Nunn and Jessie M. Mills, on the briefs).

---

[1] We utilize the parties' initials to protect the child's privacy.  R. 1:38-3(d).

A.K.S., appellant, argued the cause pro se in A-1982-19.

M.V.M., respondent, argued the cause pro se.

PER CURIAM

In three back-to-back appeals, plaintiff A.K.S. challenges custody, parenting time, and other provisions of a January 24, 2019 Dual Final Judgment of Divorce (FJOD) and companion orders dated January 25 and April 26, 2019, entered following a trial. Plaintiff also appeals from December 6, 2019 and January 15, 2020 orders adjudicating the parties' post-judgment motions.

Plaintiff and defendant M.V.M. are Indian citizens. Plaintiff moved to the United States in August 2005 to pursue his graduate degree, and has been employed under an H-1B work visa sponsored by his employer. The parties married in India in December 2011, and defendant moved to the United States under an H-4 dependent-spouse visa; defendant's visa did not permit her to work.

A.S. was born in 2013. Defendant's mother traveled to the United States one month before the child's birth and remained with the parties for five months to assist defendant during this time. After A.S.'s birth, the parties traveled to India frequently with the child between 2013 and 2015. In October 2014, the parties traveled to India, with A.S., for defendant's brother's wedding. There, defendant told plaintiff she wanted a divorce and sole custody of A.S. On

2

November 18, 2014, during their stay in India, defendant claimed plaintiff assaulted her and her father. Defendant, and plaintiff's and defendant's families attended the wedding without plaintiff.

Plaintiff left India alone on December 1, 2014, without informing defendant, taking A.S.'s passport. Once in the United States, plaintiff sent defendant an email apologizing for his conduct on November 18, and for hacking into and changing her email and Facebook account passwords without her consent. Defendant told plaintiff she was would not return to the United States because of his repeated acts of domestic violence.

Unbeknownst to defendant, plaintiff had filed a request with the United States Department of State on January 26, 2015, to enter A.S.'s passport into the Department's Child Passport Issuance Alert Program on grounds defendant had absconded with the child to India. Plaintiff then traveled to India on January 30, 2015, in an attempt to convince defendant to return to the United States with the child. During the January trip, defendant claimed plaintiff was aggressive and verbally abusive to her and her parents. On March 15, 2015, plaintiff returned to the United States, taking A.S.'s passport without informing defendant.

3 A-2233-18

In April 2015, plaintiff filed a non-dissolution complaint and order to show cause in the Family Part, alleging defendant abducted the child. Although plaintiff knew defendant's address in India, he served his pleadings at the parties' New Jersey address. Without opposition from defendant, the Family Part entered a June 8, 2015 order granting plaintiff primary residential custody of A.S. Defendant received neither the complaint and initial order to show cause, nor the final order granting it and the order was later vacated.

In November 2015, while plaintiff was in India, he reconciled with defendant and the parties returned to the United States with A.S. On May 31, 2016, defendant filed a complaint pursuant to the Prevention of Domestic Violence Act, N.J.S.A 2C:25-17 to -35, alleging plaintiff committed assault, harassment, and criminal mischief on May 29, 30, and 31, 2016. Plaintiff was arrested and charged with simple assault as a result of injuries observed by police on defendant on May 31.

In addition to the predicate acts of domestic violence, the complaint recited a history of domestic violence, namely, that plaintiff slapped defendant in 2012, 2013, and 2014. The complaint stated the 2013 incident caused "blood to ooze from [defendant's] ear." The complaint also alleged plaintiff subjected defendant to "ongoing verbal and emotional abuse" and monitored her phone

calls, and email and Facebook accounts in "March/April 2015." The court granted defendant a Temporary Restraining Order (TRO).

Plaintiff filed a complaint for divorce on July 6, 2016, seeking sole legal and primary residential custody of A.S. Defendant's counterclaim for divorce alleged extreme cruelty as one of the grounds for divorce, sought sole legal and primary residential custody of A.S., permission to remove the child to India, and monetary damages for the marital torts of assault, battery, and intentional infliction of emotional distress.

In October 2016, a different judge tried the domestic violence matter and dismissed the complaint, finding defendant failed to prove the predicate acts of assault. We reversed, reinstated the TRO, and remanded the matter for a new trial because the judge did not consider the testimony of a witness who testified, the history of domestic violence, or the allegations of harassment. M.M. v. A.S., No. A-1508-16, slip op. at 8 (App. Div. May 31, 2018). The TRO remained in place throughout the divorce trial.

On January 6, 2017, the trial judge in the matrimonial matter vacated the custody provisions of the June 2015 order and granted the parties pendente lite joint legal custody of A.S., designated defendant the parent of primary

residence, and granted plaintiff parenting time every other weekend from Friday to Sunday evening and every Thursday overnight.

On July 21, 2017, the court entered an order implementing a Memorandum of Understanding (MOU) dated June 29, 2017, addressing custody and parenting time, which the parties reached through court-initiated mediation. The MOU maintained joint legal custody of A.S., designated defendant the parent of primary residence and plaintiff the parent of alternate residence, and granted plaintiff parenting time from Tuesday evening until Thursday morning and alternating weekends. The MOU stated:

> Although this memorandum is NOT a contract, it is our desire that the terms set forth in a final judgment, by which we will be bound, and we ask that any attorney who may review this document respect the mediation process and our desire to be bound by the agreements we have reached in that process.
>
> . . . .
>
> Further, as of the signing of this agreement the parents are aware that the residency and/or immigration status of one or both parents may change after September of 2017. That being the case the parents have agreed to create a holiday and vacation parenting time schedule which will remain in effect only until December 2017 or until modified by either mutual consent of the parties or by Family Court Order.

Near the parties' signature lines, the MOU repeated the following language:

6

Though we the undersigned are aware that this memorandum is NOT a contract; it is our mutual desire that the terms herein be set forth in a final judgment, by which we will both be bound. We ask that any attorney who may review this document respect the mediation process and our mutual desire to be bound by this agreement and any decisions which were jointly made together during that process.

Both parties were self-represented at the divorce trial, which occurred over fourteen days between January and July 2018. The central dispute at trial was regarding custody of A.S., parenting time, and removal, as demonstrated by the following excerpt from the parties' opening statements:

> [Plaintiff:] . . . Your [h]onor, this case primarily revolves, more than anything else, around the relocation issue of the parties' minor child. There are other auxiliary issues, which I am hoping to address by means of trial evidence and the witnesses that I have subpoenaed as part of this trial around alimony, 50/50 custody, division of the 401[(k)], and a few other things. . . .
>
> With regards to relocation, [y]our [h]onor, I have given the defendant . . . a lot of options in court-ordered mediation, at the early settlement panel, and even . . . when we both had attorneys a few months back. . . .
>
> I am entirely uncomfortable with the relocation of the child to India.
>
> . . . .
>
> I hope [y]our [h]onor applies the best interest standard . . . as is now public policy following the

Bisbing[2] decision, and comes to a decision which allows both parties to continue parenting the child, who they both love and who the child loves both so dearly.

Thank you, [y]our [h]onor.

THE COURT: Thank you. Do you want to make an opening?

[Defendant]: Yes, [y]our [h]onor. Your [h]onor, this case . . . is about me asking relief from the [c]ourt. Namely, divorce from the plaintiff. Secondly, I am seeking sole legal custody of the child and . . . that the parent of primary residence continues to remain with me, as well as I and the child be granted the permission to relocate to the parties' home country that is India. Thirdly, [y]our [h]onor, I am seeking monetary relief; that is, child support, spousal support, equitable distribution of marital assets, and counsel fees for this case matter.

Both parties testified. Plaintiff called an immigration attorney from the law firm retained by his employer to handle his work visa, and the assistant director of the child's school as his witnesses, and defendant called a Jersey City police officer as her witness relating to the domestic violence.

The immigration attorney testified defendant's visa status derived from her marriage to plaintiff, and once the parties divorced defendant's visa would no longer be valid. The attorney explained defendant could apply for a student

---

[2] Bisbing v. Bisbing, 230 N.J. 309 (2017).

or work-sponsored visa on her own, but these visa types had accompanying risks and fees, and plaintiff's employer could not represent defendant independent of plaintiff given the divorce proceedings.

Plaintiff next called the administrator from A.S.'s school. Her testimony explained plaintiff's involvement in the child's schooling, that he performed pickups and drop offs, and that the child was on par with the school's curriculum.

Plaintiff testified in his case in chief for approximately eight days. Much of his testimony addressed his custody and parenting time requests, and defendant's request to remove A.S. to India. He blamed the parties' marital disputes on interference by defendant's family, claimed defendant interfered with his ability to parent, and that defendant assaulted him in May 2016 by spitting on him and demanding a divorce. Plaintiff also addressed the removal by presenting evidence to support his argument it was in the child's best interests to be raised in the United States due to better educational and medical systems.

Defendant called the Jersey City police officer who responded to the May 2016 incident. The officer testified defendant was "frightened [and] very scared" and her claims of abuse were consistent with the injuries the officer observed on defendant at the hospital.

Defendant testified plaintiff repeatedly physically and verbally abused her, and restricted her access to family and friends. She described incidents from January to July 2012 where he slapped her several times for not complying with his sexual demands, a December 2012 incident where plaintiff hit her so hard blood came out of her ear, the November 2014 incident when he assaulted her and her father, and the May 2016 incidents. She further testified defendant would lash out at her if she did not have meals ready for him upon his return from work.

Defendant testified she was dependent on plaintiff in the United States due to her inability to obtain employment because of her visa status. She explained her visa would become void upon the parties' divorce and she would be compelled to return to India. She said she explored obtaining a student visa, but the financial costs and risks outweighed the benefits.

Defendant explained in detail why removal was in A.S.'s best interests and explained her role as the child's primary caregiver. In contrast to her inability to live independently in the United States, defendant furnished proof of a job in India sufficient to meet her and A.S.'s needs. She also testified both her and plaintiff's families live within a twenty to twenty-five-mile radius of where she intended to live, furnished photographs showing A.S.'s relationship with his

extended family, and proof of the child's enrichment activities when he was in India.

On January 24, 2019, the trial judge rendered a comprehensive oral decision totaling 181 pages. The judge credited the testimony of the school representative, finding it demonstrated plaintiff was an involved parent. The judge credited the immigration attorney's testimony, finding it disproved plaintiff's claim he obtained special favors from his employer resulting in an extension of defendant's visa. The judge found this was "one of the many examples [the court] finds of plaintiff's lack of candor[.]"

The judge found plaintiff lacked credibility, particularly regarding his claim defendant had abducted A.S. The judge made numerous and detailed credibility findings. She stated:

> It is clear, and the parties' testimony confirms, that this family left for India together on a preplanned trip. It is also clear that it was plaintiff who left after the assault on the defendant and the defendant's father[,] and took with him Ay[.S.]'s U.S. passport.
>
> The [c]ourt finds defendant's testimony on this event much more credible than the plaintiff's. She was consistent, clear and spoke with a recollection of the events that was both convincing, as well as non-wavering. Unlike much of plaintiff's recollection, defendant's testimony was precise. She did not forget to include events in her original recitation of the facts

and then include them later when only after confronted with an omission.

Throughout [plaintiff]'s testimony, he would make sweeping statements, such as my family was disinvited to defendant's brother's wedding, only to be shown . . . photos depicting his parents at the events. He could offer no explanation for his misstatement.

Throughout the trial, defendant was able to undercut plaintiff's credibility. For example, . . . defendant was able to show that plaintiff's father was present at the [second] birthday party she threw for their son in April 2015. When confronted with this, plaintiff changed his response, responding that his father was not invited, but showed up at the festivities. The court did not find this testimony credible.

Further, the judge cited plaintiff's own emails in which he admitted leaving defendant and the child in India to return to the United States and changing her passwords as other examples of his "less-than-credible testimony" at trial. The judge also found plaintiff's assertion that he registered the child's passport with the State Department to prevent defendant from removing A.S. to another jurisdiction not credible because she "was not convinced . . . that there was ever a credible threat of . . . defendant removing the child from India."

The judge found plaintiff obtained the relief in the non-dissolution matter ex parte by deliberately failing to serve defendant at her actual address. The judge rejected plaintiff's claim that he served defendant through an Indian

attorney. She credited defendant's testimony that she never received the papers and the attorney did not represent her and was instead her father's real estate counsel in India. She also found "no proof was provided to the [judge in the non-dissolution matter] where the [attorney] had been retained to accept service for or on behalf of the defendant. . . . It is clear to the [c]ourt that plaintiff did not want defendant to be apprised of the order to show cause."

The judge rejected plaintiff's testimony stating he had contacted the FBI about the alleged abduction and that they suggested criminal charges could be brought against defendant. The judge concluded plaintiff's testimony was not credible because during cross-examination "it became clear that [plaintiff] didn't visit the FBI or . . . speak directly to anyone other than a person who answered the hotline. . . . Plaintiff's testimony was barren as to any particulars." The judge also rejected plaintiff's testimony that the State Department considered A.S.'s retention in India to be abduction. The judge stated:

> It is clear from the [c]ourt's review of [the State Department] letter that the State Department took no official action in this case, it merely opened a case based on the plaintiff's report that Ay[.S.] had been abducted to India by his mother. . . . This opening of the case does nothing to establish plaintiff's underlying position that . . . defendant abducted or wrongfully retained the parties' child in India. Indeed, the letter from the State Department is no more than a typed up version of what plaintiff said and nothing more.

The judge made detailed findings under each N.J.S.A. 9:2-4(c) factor and concluded they preponderated in favor of awarding the parties joint legal custody with defendant having primary residential custody, and permitting the removal of A.S. to India. We recount the factors relevant to the issues in this appeal.

Addressing the first statutory factor, the judge found defendant minimizes the contact "she needs to have with the plaintiff, especially contact that is not supervised by either . . . police or an official . . . and the [c]ourt is not surprised by this, given that she has been subjected to . . . cycles of both violence and verbal abuse." The judge concluded despite "both parents . . . [being] guilty to some degree in failing to communicate in a timely manner . . . the parties do have the ability to communicate on matters involving the child[.]"

Addressing the second statutory factor, the judge stated:

> [I]t's clear that both of these people want custody, both of these parents . . . are willing to accept custody. . . . [T]he main issue that these two parties tried, . . . is was this an abduction case or was this a case of a woman escaping a domestic violence relationship and went back home and stayed with her parents for her own safety and that of the child.
>
> . . . Much of the plaintiff's case in chief was devoted to his portraying that the defendant abducted Ay[.S.] to India and her continued retention of the child in India.

A-2233-18

The [c]ourt finds that the facts of this case simply do not support plaintiff's version of an abduction or a wrongful retention.

Citing the evidence presented relating to the December 2014 incident, the judge concluded plaintiff "snuck out of India without [defendant's] notice and with the child's passport under the cover of night. Despite plaintiff's protestation to the contrary, he did indeed abandon the defendant." The judge found the credible evidence also proved plaintiff left India again without notice and with the child's passport after perpetrating the March 2015 incident.

Furthermore, the judge stated:

[W]hat is clear to the [c]ourt is that there's information in the record which corroborates defendant's version of abuse inflicted upon her, both physically and verbally, at the hands of plaintiff and plaintiff, not defendant's conduct, separated him from his child.

Defendant remained in India with the child in an effort to keep herself safe. There is nothing in this record to support any other conclusion. . . .

[Defendant] was left by her husband on not one, but two occasions in India without advanced notice and no arrangements for the support of the child. He just left. And when it was clear to him that their marriage was in trouble and they may not reconcile, then and only then did he start to suggest an abduction. Indeed, the [c]ourt scoured the emails submitted to find one email, letter, et cetera prior to May of [2016] to support plaintiff's suggestion that he believed [defendant] abducted or wrongfully retained the child prior to his

15

April order to show cause. The [c]ourt could not find one.

. . . .

[After plaintiff filed the order to show cause, n]owhere in any of the email exchanges between the parties during this time does plaintiff ever advise defendant of court action in the U.S. . . . Instead, he keeps it as a secret.

The [c]ourt is left to wonder why would anyone get an order if they are not undertaking to pursue the relief awarded, namely the return of the child.

Addressing the fourth statutory factor, the judge found defendant's testimony credible that from January to July of 2012, plaintiff would strike her if she did not comply with his demands for sex, hit her if meals were not ready when he came home, and that he admitted to abusing defendant. Beyond the May 2016 incidents, the judge noted the incident where defendant testified that during her pregnancy, plaintiff struck her and caused her ear to bleed, was corroborated by a medical report in evidence. The judge also found defendant's testimony credible that when the parties returned to the United States, plaintiff became threatening and attempted to control defendant by telling her to get pregnant again, taking her phone, and demanding she immediately return home if she was out with the child. The court recounted defendant

16

testified throughout the trial that plaintiff would often ridicule her for not working, stating that she didn't know the value of money, because she did not make money . . . [a]nd . . . was again . . . taunted about [that at a later date] . . . .

. . . .

The [c]ourt finds that there was an extensive history of domestic violence between plaintiff and the defendant, some of which occurred in front of [A.S.].

The [c]ourt further finds that there was not an iota of credible evidence or testimony before the [c]ourt to support a finding that the defendant had been the aggressor in any incident or that she had in any way verbally or physically abused plaintiff. Rather, the evidence the [c]ourt finds credible clearly demonstrates plaintiff has committed acts of domestic violence upon the defendant from the inception of the parties' marriage beginning in early 2012 until the day of their final separation on May 31st, 2016.

Indeed, plaintiff was convicted of simple assault arising from that May 31st, 2016 domestic violence incident on June 19, 2017[,] in the Jersey City Municipal Court. . . . Defendant testified at trial that he has filed an appeal in that case.

Concomitantly, under the fourth statutory factor, the judge concluded "defendant is not safe from physical abuse by the plaintiff." The judge again noted defendant "often could particularize the events, giving even minute details of what occurred, unlike the plaintiff in many instances. She did not have differing recollections, nor did she contradict herself when confronted with

17

evidence undercutting her initial version of the events." The judge characterized defendant's recollection as "clear," her testimony "frank," her demeanor on cross-examination "unshakeable" and "[o]verall, defendant's testimony was credible, believable, and consistent."

Reciting the seventh statutory factor, the judge found both parties capable of meeting the child's needs. Addressing the stability of the child's home environment under the eighth statutory factor, the judge found defendant provided A.S. with "a stable home of love and nurturing" in both the United States and India. However, the judge credited defendant's testimony that "when the parties were in a fight and the plaintiff was mad at her, that the plaintiff would take Ay[.S.] and lock himself in a room and cut the child off from the defendant and the defendant's care of the child." The judge found "it was plaintiff and his conduct that had created the negative impact of the stability of Ay[.S.'s] home environment."

With regard to the ninth statutory factor, the judge determined defendant was fit, having parented A.S. since birth, but found plaintiff obtaining ex parte custody orders to create a record that defendant abducted the child "affects whether plaintiff is fit to parent Ay[.S.]" The judge further found although "plaintiff is a devoted, committed parent to Ay[.S.], his conduct toward

18

defendant committed in front of Ay[.S.] or within earshot of him, slapping his wife, yelling at her, demeaning her and her family in front of the child, affects his fitness to parent."

Under the eleventh statutory factor requiring the court to assess the extent and the quality of the time each parent spent with the child prior to and after their separation, the judge noted "both [parties] went to every doctor appointment and wrote down everything, but that's not what the primary caretaker's function is." The judge concluded because plaintiff had work obligations, "the only constant daily caretaker was [defendant]. . . . The [c]ourt finds that the defendant has spent extensive time as the parent of primary residence or the primary caretaker of the child." However, the judge also concluded that since the entry of a January 2017 parenting time order, "plaintiff has exercised consistent frequent contact in parenting time with Ay[.S.]."

Addressing the last statutory factor, the judge found defendant was not employed "outside of the home during [the] marriage and post-complaint [time period.]" However, "[d]efendant testified that she has the promise of employment in India and the [c]ourt finds that if she is permitted to relocate, she and the plaintiff will then have work responsibilities to contend with in relation to the parenting time with the child."

The judge also found defendant had demonstrated cause pursuant to N.J.S.A. 9:2-2 and proved it was in A.S.'s best interests under Bisbing to remove the child based on plaintiff's efforts to prevent defendant from living in the United States through the immigration system and the domestic violence. The judge quoted from a May 2015 email plaintiff wrote defendant after leaving her in India in which he stated:

> As for working in the U.S. without staying with me, this is out of the question. Any H-4 status benefits that you may be entitled to . . . are derived benefits as a result of my primary H-1B status in the United States. Upon divorce, you are not entitled to any such benefits without being a beneficiary . . . . Anyways, I have already relayed to immigration our pending divorce and to hence have your H-4 status terminated in the United States, so there is no question of you gaining H-4 EAD [Employment Authorization Document] benefits in this context anymore.

The judge concluded as follows:

> This email . . . exemplifies plaintiff's conduct with respect to the defendant during the marriage. Again, he made it clear you don't live with me, I've already told them there is no status for you. And again, I note this because it exemplifies the reasons the defendant desires and her need to relocate the child to India with her.

The judge stated:

> In addition to having no family here, being the victim of domestic violence, it is also clear that once

20

these parties divorce . . . defendant loses . . . her . . . visa status.

. . . . She must remove herself from the United States.

The [c]ourt must then consider, is it in the best interests of Ay[.S.] to remain here in the United States or to leave the United States and relocate with his mother to India. Under all of the facts herein, the [c]ourt is satisfied that under these particular factors Ay[.S.]'s best interests will be served by allowing him to relocate to India with his mother.

. . . .

Given that the defendant has continually been the primary caretaker of the child and the parent of primary residence, the [c]ourt finds that it is in the child's best interests to remain with his primary caretaker.

Addressing the standards of living between the United States and India, the judge explained the evidence presented showed the child's lifestyle would "not be diminished" in India. The judge noted plaintiff testified the educational, health and "overall environment is not as good in India[,]" but concluded "I have no credible proof before me that the educational institutions[,] . . . the medical institutions in India are any less qualified than those here in the United States." The judge rejected plaintiff's argument that smog in India was a reason to deny the removal and concluded

Ay[.S.]'s best interests will be served by continuing under the care of his mother. She has

21

consistently made the child her priority, giving herself entirely to the raising of him and the protecting of him. Hers is the more stable environment for Ay[.S.], one filled with peace and respect and lack of violence.

. . . .

The [c]ourt notes that [India] is a familiar place to Ay[.S.]  He has spent a considerable period of time there prior to the instant divorce proceeding. . . .

It is clear that, but for these divorce proceedings, Ay[.S.] would have continued to travel back and forth to India with his parents for vacations, celebrations of holidays, special family events and the like.

The judge further noted plaintiff's work schedule permitted him to work from his employer's office in India and "it is possible that plaintiff himself could relocate to India and still maintain his employment. . . .  [Moreover, p]laintiff has presented no credible evidence . . . to suggest that he would be unable to return to India for parenting time . . . once the child relocates."  She rejected plaintiff's argument that the legal system in India was unfair, noting plaintiff had abused the process in the United States to obtain an ex parte custody order and served an unauthorized individual in India.

The judge rejected plaintiff's argument that defendant had interfered with his ability to communicate with A.S. in India.  She noted the examples of interference cited by plaintiff occurred when the child was "approximately two

22

years of age with very little verbal skills."  The judge found "Ay[.S.] is almost six years of age.  He and his dad have established their own rituals.  Ay[.S.] no longer needs to rely upon the defendant for all his care."  The judge concluded as follows:

> There is evidence in the record to demonstrate the defendant has done all she can to foster a positive image of plaintiff in their son's eyes, despite her personal experiences.
>
> Plaintiff did not offer any testimony or evidence to suggest that the defendant has attempted to do anything to inhibit the parent-child relationship.

The judge entered the FJOD on January 24, 2019, granting the parties joint legal custody of A.S., designating defendant as parent of primary residence, and permitting the removal.  The judge also granted the following relief:

> The [c]ourt recognizes that a parenting plan is necessary to ensure frequent contact between the plaintiff and Ay[.S.].  As such, the [c]ourt orders that plaintiff shall be permitted vacation parenting time the child each year in line for the time that the child is off for school for vacation.
>
> Given that limited information is known about the child's school vacation, the [c]ourt orders that [defendant] provide to the [c]ourt and plaintiff a schedule with the school calendar to enable the [c]ourt to . . . block out periods of time Ay[.S.] shall travel to the United States to exercise his time with his father.

The [c]ourt recognizes that vacation time will be the bulk of the time that the child spends with his father, so the father should be permitted the majority of the child's vacation parenting time.

Additionally, the father shall be permitted to have parenting time with the child in India on notice to defendant at least [thirty] days prior to the scheduled parenting time. If plaintiff comes to India to celebrate holidays, the parties shall alternate the holiday[s] yearly . . . .

The parties shall use their best efforts to ensure Ay[.S.] has consistent parenting time with his father yearly.

The parties shall also be responsible each for [fifty] percent of the cost of Ay[.S.]'s plane fare for his yearly vacation parenting time. Tickets shall be purchased in advance to ensure the parties of the best price.

. . . .

It is the [c]ourt's intention for plaintiff to have parenting time with Ay[.S.] in the U.S. for each vacation as the Indian authorities define it, from five days after school closes until one week before school starts. The [c]ourt has established that this will amount to approximately six weeks of parenting time vacation for the child here in the United States.

Additionally, plaintiff would be permitted parenting time in India upon notice to the defendant.

. . . .

24

As such, if [plaintiff] travels to India, he shall be permitted overnight parenting time with the child during his stay. This parenting time shall not, however, interfere with the child's schooling and the child must attend school even when his father visits.

. . . .

. . . . This award carries with it, however, an obligation by the custodial parent to foster and maintain the father-son relationship.

As such, in addition to what has already been ordered, the [c]ourt shall order FaceTime between the father and the son three times per week, with at least one day taking place on the weekend. Unless the parties agree otherwise, the child shall have FaceTime with dad on Monday, on Wednesday and on Sunday of each week. At a time to be set by the parties. To ensure that there is consistent FaceTime.

Finally, the Court orders the parties to sign up for Family Wizard within [fourteen] days of the defendant's relocation to India. All communications and schedules, et cetera, shall be done in Family Wizard.

The judge awarded child support in accordance with the Child Support Guidelines and ordered the parties to "discuss and agree what school best fits the needs of the child and their ability to pay for same. The parties shall . . . each pay their share [of the schooling costs] according to the guidelines percentages[,]" which were sixty-four percent plaintiff and thirty-six percent defendant.

The judge adjudicated defendant's marital tort claims and found she proved plaintiff committed assault and battery and awarded defendant $7500 in compensatory damages. After addressing the equitable distribution factors under N.J.S.A. 2A:34-23.1, the judge ordered, among other relief, that defendant receive a thirty percent of the marital portion of plaintiff's 401(k). The judge ordered plaintiff to have a QDRO[3] prepared to divide the asset. The judge also awarded defendant $18,800 representing unpaid pendente lite support and counsel fees the court had ordered plaintiff to pay defendant in a June 23, 2017 pendente lite order.

Plaintiff sought a stay of the judge's decision, which she denied. On January 25, 2019, the judge signed an order vacating a pendente lite order preventing international travel with the child. We heard and denied plaintiff's motion for a stay and the Supreme Court also denied his motion for a stay. Plaintiff filed a notice of appeal from the January 24 FJOD and January 25 order on January 29, 2019.

In February 2019, defendant and A.S. moved to India. Pursuant to the FJOD, the parties began researching potential schools for the child, but disagreed on the choice of school. Plaintiff claimed defendant unilaterally

---

[3] Qualified Domestic Relations Order.

enrolled the child in JBCN International School in Mumbai for the remainder of kindergarten and a different school for first grade, which "drastically shortened" his summer parenting time with A.S.

Plaintiff filed a post-judgment motion to compel defendant to: (1) disclose the child's address in India; (2) disclose the school selection process; (3) establish a video call schedule between plaintiff and A.S.; and (4) confirm his summer vacation parenting time schedule and travel arrangements, among other requested relief. Defendant cross moved to: (1) compel plaintiff to pay A.S.'s school tuition; (2) enforce the monetary awards in the judgment of divorce and compel plaintiff to execute a QDRO for his 401(k); (3) sanction plaintiff for contempt of the judgment; (4) make a number of specific findings with respect to the January 24, 2019 decision; (5) compel plaintiff to cease all threatening and harassing communications; (6) compel plaintiff to cease making video recordings of his video calls with the child; (7) compel plaintiff to cease all purported "tactical manipulative communications" during the calls; and (8) compel plaintiff to cooperate in the school selection process, among other requested relief.

On April 4, 2019, the trial judge entered an order clarifying that the guidelines for parenting time were calculated assuming defendant lived in India

with A.S. and that plaintiff exercised a minimum of six weeks' parenting time. The order restated the January 24 FJOD's provisions that plaintiff was to have FaceTime/Skype sessions with A.S. three times per week on Monday, Wednesday, and Sunday unless the parties decided otherwise. The order also clarified that the judge intended that A.S. would spend seventy-five percent of his summer vacation time with plaintiff, and restated the finding the summer vacation time was to commence five days after school ends through one week before the start of school.

On April 26, 2019, the trial judge heard argument and testimony from both parties on their post-judgment motions. At the outset, the judge noted because of the pending appeal, she had limited jurisdiction only to enforce her orders and therefore could not decide several items of relief in plaintiff's motion. Relating to the issues raised on this appeal, plaintiff claimed defendant cut off and interfered with the FaceTime calls. He also claimed defendant unilaterally selected the child's school and purposefully chose a school whose schedule shortened plaintiff's 2019 summer parenting time. Plaintiff argued defendant interfered with the paternal grandparent's ability to visit A.S.

Defendant denied interfering with plaintiff's calls and testified plaintiff insisted on having A.S. close the door during the calls, which worried her.

Regarding the child's schooling, defendant stated plaintiff failed to respond to a list of schools she provided for A.S. to attend kindergarten, and schools on plaintiff's list were ones the parties could not afford and were not accepting admission for A.S.'s grade level. Defendant noted she selected JBCN because it was the only mutually agreed-upon school willing to admit A.S.

After reviewing the evidence relating to FaceTime calls, the judge discerned no interference by defendant. The judge noted the friendly nature of the calls and remarked to plaintiff as follows:

> I had the ability to watch the FaceTime and while I know it was somewhat disruptive, . . . I don't know if you're realizing this, you got to be part of Ay[.S.] and his friends that day, and I thought it was remarkable that the girl, whoever she was, . . . she kept refocusing him. "He's talking to you." "He's talking to you." And I say that because although you weren't there [physically], you were there with him and his friends and I thought that as a parent that was a different dimension . . . they play[ed] with you as much as he played with you, and I thought that was neat.

The judge concluded

> I don't have anything on this record where I could find that either plaintiff or the defendant intentionally cut [FaceTime videos] off. . . . [W]e had some technological differences. I noted that when [plaintiff] was speaking to one of the schools he was cut off. . . . I saw on the FaceTime that it would be paused and then it would come back. . . . I can't make the finding . . . that it's an intentional interference. . . . I'm just hopeful

A-2233-18

that we can eliminate the outside distractions during these periods of time when the child has FaceTime with dad, so, that [A.S.] can get the most out of the experience.

Regarding the summer parenting time issue, the judge noted neither party testified in the divorce trial "how long vacation in India was." Regardless, the judge explained the

court['s] decision with respect to summer vacation was, the child comes five days after school closes, so, if the school closes on Friday, five days after and is returned one week before. . . . That is the [c]ourt[']s order. I am not free to modify [it].

. . . .

It's always going to be five days after the current year, to one week before.

The judge denied the request that the court select the school as beyond her enforcement jurisdiction. She also enforced the monetary judgments set forth in the FJOD and required plaintiff to obtain the QDRO.

In the April 26, 2019 order, the judge added that plaintiff was required to provide proof he executed the QDRO for his 401(k) within thirty days and had ninety days to pay the compensatory damages and the pendente lite counsel fees awarded in the FJOD. The order also contained a provision granting defendant's request that "[p]laintiff shall cease all tactical and manipulative communications

during [FaceTime] videocall sessions and phone-calls with the parties' child in on-going attempts to harm the safety of the parties' child and negatively influence child against [d]efendant and [d]efendant's family . . . ." Plaintiff appealed from the April 26, 2019 order.

The post-judgment litigation continued. On November 8, 2019, the trial judge entered an order adjudicating various requests from both parties. We highlight the portions of the order relevant to our discussion which follows. The November order stated A.S. would visit plaintiff in the United States for two weeks during his winter recess specifically from December 21 to January 1, 2019, and reiterated the parties were to split the child's airline ticket cost equally. The judge clarified the April 26, 2019 order did not require plaintiff to travel to India to bring A.S. to the United States and stated if defendant could not accompany the child, then his paternal grandparents could do so instead. The order stated the court reserved on plaintiff's request to hold defendant in contempt until the court was assured "both parties have complied with [the] outstanding financial obligations."

The matter returned to court on December 6, 2019, on competing motions by the parties to enforce the FJOD and the April 26, 2019 order. Defendant alleged plaintiff violated the court's order relating to winter vacation time by

failing to return the child to India on January 1, 2020, and instead booking a flight for the following day. She also alleged defendant failed to: pay his share of the child's school tuition and the money judgments awarded defendant; satisfy a marital debt; and complete the QDRO. Plaintiff argued defendant failed to comply with her obligations to obtain health and life insurance under the April 26, 2019 order. He also claimed defendant failed to send the child to the United States for the summer vacation on a flight he had booked for the child and his paternal grandmother, and requested the court award him the "no show" and ticket change fees associated with the child and grandmother's tickets, and half of the child's ticket fare.

Plaintiff conceded he had not complied with his obligation to pay defendant the money judgments or complete the QDRO as set forth in the April 26, 2019 order, and requested the court deduct the sum he claimed defendant owed him for the airline tickets and fees from the amount he owed defendant. He also alleged defendant failed to make the child available for holiday vacation parenting time, and canceled FaceTime sessions at the last minute and requested the court order her to provide advance notice before doing so. Plaintiff provided video of the FaceTime calls to the court and argued defendant was interfering with his time with the child by leaving the door to the room open allowing "free

traffic.  People coming in, people going out, the village coming in, the village leaving, people distracting [A.S.]."

The trial judge addressed the FaceTime calls at the outset of her oral findings.  She noted she reviewed the video plaintiff provided and

> there were instances where the child . . . and I will note large periods of time where the child either put it on pause, walked away, . . . kept cutting dad off.
>
> . . . A good portion of it was reflective that it's the child. . . . [Plaintiff] would attempt to engage the child. Whether the child was tired, I put in my notes and no disrespect to Ay[.S.], he was whining, I don't want to talk, stop, call back tomorrow.
>
> . . . So, . . . the snippets that I watched, there weren't any people in the ones that I have watched.  So, it wasn't Grand Central Station, not like the original ones when all the kids were involved.  . . . [T]he ones that I was able to view are the ones of Ay[.S.] and his dad.  We had Mr. Stuffed Animal in there.  We had the globe in there.  We had Alexa in there.  . . . Alexa being the computer, and . . . [plaintiff] was doing everything . . . to engage Ay[.S.] . . . you know, the geography game, the latitude game.  We renamed our icons on the computer.  It just went on and on and on, but, again, the take away is that this is a young child who just loses interest and . . . or wants to just be . . . [,] as [plaintiff] called him, a trickster and would snap off.
>
> . . . .
>
> Obviously, [plaintiff] is saying to me that the child is leaving to seek direction, and on this video,

33

again, he clearly left the room and then at one point he does come back and say, mom said change the topic.

. . . .

. . . . [F]rom what I could see, clearly the child left, but she didn't come in and pull him out. This is the child leaving, asking mom questions, and I can't say that mom is pulling the strings.

The judge granted defendant's request to enforce the money judgments entered against plaintiff and compel him to obtain the QDRO. Noting both parties could be subject to sanctions, she stated:

[Plaintiff] for not complying with the [c]ourt's order with respect to the payment of money and the QDROing of his funds, and [defendant] as well by not obtaining the health and the life insurance that I required with respect to the child. [However,] . . . I'm reserving on that for now.

The judge ordered plaintiff to satisfy the marital debt in thirty days. She ordered him to cease taking unauthorized deductions of the money owed to defendant. The judge reserved on defendant's request for the child's past due school tuition, subject to the submission of clearer proofs by defendant.

Defendant requested the court order plaintiff to "cease all tactical, and manipulative communications during FaceTime, video call sessions with parties' child in an ongoing attempt to harm the safety of the parties' child and to negatively influence the parties' child against the defendant and the defendant's

family in India since this is detrimental to the best interests." The judge denied the request stating:

> Again, I have no credible proof before me that that was occurring. The video snippets that I was able to see really has nothing to do with the defendant, or defendant's family. It's just the plaintiff, and the plaintiff's relationship with the child. But I had previously ordered that neither one of you do anything as part of my judgment to alienate the affections. Ay[.S.] has the right to have a relationship, but I don't find that there's been any proof before me that [plaintiff] has [violated the court's order]. So, I'm going to deny it, because it suggests that he has, and I can't find it upon the record before me.

The judge granted plaintiff's request that defendant bear one half of the airline ticket fare for the child's missed flight during the summer of 2019. The judge reserved on plaintiff's request for reimbursement of the no show fees subject to her review of plaintiff's bank statements. The judge also granted plaintiff's request for compensatory parenting time related to another vacation the child did not enjoy with plaintiff. However, the judge denied plaintiff's request to extend winter parenting time to January 2, and instead enforced the judgment noting it contemplated "[A.S.] was allowed to stay [in the United States] until the 1st," and could not remain until January 2.

The judge denied plaintiff's request to move the FaceTime sessions to his parents' home, noting there was no evidence defendant or others interfered with

the calls and the child's distractions were due to his young age.  Addressing

plaintiff, the judge stated:

> I watched hours of these videos and I didn't see anyone else interacting.  It was just you and Ay[.S.].  I explained to you that if you wanted me to see . . . particular people there, okay, point me to that one. . . . There was no one there.
>
> So, today you said, Judge, I want to bring this one up, and I'm all for it, but if you're taking hours and hours of video, and that there may be one, two, three times in these hours, or at least the ones that [have] been reproduced, I can't find that the parade is in the room. It's your son[.]
>
> . . . .
>
> He's six . . . .  A child can look wherever.  You want me to see something that I've not been able to see, and, again, I gave you that opportunity last time. . . .  If there's a particularly egregious day, again, I'm not seeing it, but if you want me to just surmise that because he's looking around somebody is in the shadows[,] I couldn't make that finding.

Next, the judge addressed plaintiff's request for grandparent visitation and

the following colloquy ensued:

> THE COURT:  . . . [A]gain, we've talked about the grandparents.  I didn't have a request during the trial.  I didn't order grandparent parenting time.  I recognize [plaintiff] has couched it now in terms of a best interest, but you recognize that there's an appeal, so, I can't make a determination that not seeing the grandparents is or isn't in the child's best interests.

36

[Plaintiff]: Well, you made that determination at trial, Judge.

THE COURT: No, what I said at trial, and I recognize . . . .

[Plaintiff]: When you said that all the grandparents that are in India that's why he's moving to India.

THE COURT: I didn't say that, sir. What I reminded everyone was . . . this child had spent a tremendous amount of time in India. India wasn't a foreign country to him. He had gone over there and stayed at the grandparent's house. I didn't say he was allowed to move because his grandparents were India. And, quite frankly, if somebody had wanted to secure grandparent rights they could have done that at the trial. We could have tried an issue with respect to . . . I want my parents or I want my parents, either one of you could. Neither one of you did, and now I can't do it on appeal because it's not part of the reliefs I requested.

[Plaintiff]: I understand, Judge.

. . . .

[Plaintiff]: Either you find it in his best interest or not. It's one of those two things; right?

THE COURT: Again, . . . grandparent visitation isn't part of someone's best interest. It's an actual statute that you have to comply with. Either . . . you or [defendant] could have made that statute and the grandparent's rights to . . . visitation, part of a trial. But . . . you went to the Appellate Division. I didn't order, and I can only enforce now that which . . . I ordered.

The judge found insufficient evidence to conclude defendant repeatedly canceled FaceTime sessions but granted the part of plaintiff's request requiring the parties provide one day's notice before rescheduling a session. She denied plaintiff's request to find defendant denigrated plaintiff or spoke "harshly" about him in front of the child, finding there was no proof of defendant's conduct.

The judge denied plaintiff's request to impose sanctions on defendant relating to the missed vacation time and other relief requested in plaintiff's motion relating to financial issues. She noted plaintiff was in violation of the orders requiring him to pay the money judgments awarded defendant and had unclean hands. However, the judge further stated:

> Neither one of you have done all that you are ordered to do. So, I'm going to deny the request for sanctions. I'm not going to sanction her, and I'm not going to sanction you.

Following arguments, the trial judge issued a written order on December 6, 2019, which denied plaintiff's motion seeking modification of relief granted in the FJOD and the April 26, 2019 order; enforced the FJOD by compelling plaintiff to comply with his financial obligations, and sanctioned plaintiff for "repeated [c]ontempt" of the court and "repeated violations of [c]ourt [o]rders." The order stated as follows:

a. Plaintiff did not comply with the 04/26/19 [c]ourt [o]rder that enforced the 1/24/19 FJOD to have [p]laintiff QDRO his 401([k]) and that ordered [p]laintiff to submit a proof of the same within thirty . . . days of 04/26/19;

b. Plaintiff did not comply with the 04/26/19 [c]ourt [o]rder that enforced the 1/24/19 FJOD to have [p]laintiff provide pending additional support to [d]efendant in the amount of [$2300] for six months and [$5000] towards pending [c]ounsel fees, totaling $18,800, and that ordered [p]laintiff to submit a proof of payment within ninety . . . days of 04/26/19;

c. Plaintiff did not comply with the 04/26/19 [c]ourt [o]rder that enforced the 01/24/19 FJOD to have [p]laintiff provide [d]efendant with compensatory damages in the amount of [$7500] for perpetrating assault and battery and that ordered [p]laintiff to submit a proof of the payment within ninety . . . days of 04/26/19;

d. Plaintiff did not comply with the 04/26/19 [c]ourt [o]rder that enforced the 01/24/19 FJOD to have [p]laintiff provide [d]efendant with [c]ounsel [f]ees in the amount of [$7773] for the pendente-lite support motion returnable February 2017 and that ordered [p]laintiff to submit a proof of the payment within ninety . . . days of 4/26/19;

e. Plaintiff did not comply with the [c]ourt [o]rders dated 03/30/17 that ordered [p]laintiff to QDRO his 401(k) and instead, [p]laintiff made unauthorized post-complaint withdrawals of $21,067[], absent any [c]ourt [o]rders; [and]

f. Plaintiff did not comply with [c]ourt [o]rders dated 06/23/17 that ordered [p]laintiff to pay additional

39

support to [d]efendant in the amount of [$2300] for six months and [$5000] towards pending [c]ounsel fees, totaling $18,800[.]

The order enforced the FJOD by compelling plaintiff to pay the marital debt and unreimbursed medical expenses for the child of $2139.53 and $337.93, respectively. The order also reprimanded and compelled plaintiff "to stop demanding [d]efendant to work with QDRO agencies for the QDRO and liquidation of [p]laintiff's 401([k]) account through [p]laintiff's employer," and issued sanctions against plaintiff for "on-going frivolous [m]otion filings, despite his pending appeals, driven by improper purposes to cause [d]efendant harassment, irreparable harm and unnecessary legal expenses."

On January 15, 2020, after reviewing statements plaintiff submitted, the judge issued a companion order to the December 6, 2019 order addressing plaintiff's request for reimbursement of the ticket change and no-show penalties relating to the 2019 summer vacation. The judge stated:

> With respect to the demand by [plaintiff] for reimbursement of the cost of penalties incurred by him as a result of [defendant's] failure to send Ay[.S.] on May 15, 2019[,] as well as the date change costs incurred as a result of a discrepancy in the date Ay[.S.] returned to school, a review of the record provides [p]laintiff is seeking reimbursement of costs for not only Ay[.S.] but also for costs associated with [the paternal grandmother]'s airline tickets. It is clear from the [c]ourt's review of the submitted documents it is

40

being asked to consider awarding fees and penalties for an individual who was not part of the [c]ourt's [FJOD]. Nowhere in [plaintiff]'s certification did he state that the $1076.11 of no-show fees and penalties sought included fees/penalties for his mother's ticket. Indeed, with respect to the no-show fees in the proofs provided there is no breakdown of Ay[.S.]'s ticket cost and the penalties/fees chargeable only as to his tickets.

As a result of continual motion practice [while this matter is on appeal] . . . the [c]ourt is only permitted to enforce its prior orders. It is not permitted to consider any requested relief not in the nature of an enforcement. [Plaintiff]'s request for reimbursement costs incurred for his mother's ticket is clearly not within the purview of an enforcement action.

. . . .

The [c]ourt has no authority at this time to consider the no-show costs incurred for [plaintiff's] mother. These penalties and costs are not the child's and therefore not part of an enforcement application.

[Plaintiff]'s submissions with respect to the no-show costs for Ay[.S.]'s ticket does not allow the [c]ourt to make the necessary determination as to the reimbursement amount owed to [p]laintiff.

. . . .

From the proofs offered[,] the [c]ourt does not find [plaintiff] has demonstrated by a preponderance of the credible evidence that [defendant] gave inaccurate information as to the date Ay[.S.]'s new school would re-open from summer vacation. From the submissions provided the [c]ourt does not find [defendant]

intentionally misled either the [c]ourt of [plaintiff] about the opening date of Ay[.S.]'s school [JBCN].

. . . .

No credible evidence was presented to the court which would warrant a hearing on the issue of change of date fees. The record supports a finding that as of the date the parties appeared before the court on April 26[,] no definitive . . . school opening date was known. The fact that defendant thereafter purchased tickets for a return date which was incorrect, without more, does not provide a basis for a finding that it was [defendant] who misled the [c]ourt and [p]laintiff and therefore she should be responsible for Ay[.S.]'s change of date fees. Given that the [c]ourt does not find [defendant] misled either the [c]ourt or [plaintiff] the [c]ourt does not find [defendant] is responsible for the change in date fees/costs.

. . . .

[Plaintiff] shall forward his [seventy percent] share of the outstanding school fees to [defendant] within thirty . . . days of this [o]rder.

Plaintiff also appealed from the December 6, 2019 and January 15, 2020 orders.

## I.

"The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). A trial court's opinion is "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484

(1974)).  "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'"  Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

"Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters."  Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412).  "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'"  Cesare, 154 N.J. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).  "We do 'not disturb the "factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."'"  Gnall v. Gnall, 222 N.J. 414, 428 (2015) (alterations in original) (quoting Cesare, 154 N.J. at 412).  Therefore, "'[o]nly when the trial court's conclusions are so "clearly mistaken" or "wide of the mark" should we interfere[.]'"  Ibid. (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).  However, "we owe no deference to the judge's decision on an issue of law or the legal consequences

that flow from established facts." <u>Dever v. Howell</u>, 456 N.J. Super. 300, 309 (App. Div. 2018).

II.

In A-2233-18, plaintiff raises the following points:

> I. DEFENDANT FAILED TO DEMONSTRATE A LEGITIMATE, SUBSTANTIAL CHANGE IN CIRCUMSTANCES WARRANTING A MODIFICATION OF THE JULY 21, 2017 CUSTODY AND PARENTING TIME CONSENT ORDER.
>
> > A. The court erred when it failed to order the custody arrangement agreed upon by the parties.
> >
> > B. Defendant failed to demonstrate that relocation of the parties' child to India is in the child's best interests.
>
> II. THE TRIAL COURT DECREASED PLAINTIFF'S PARENTING TIME WITHOUT INPUT FROM ANY EXPERT AND LESS THAN TWO . . . YEARS AFTER THE PARTIES AGREED THAT IT WAS IN THE CHILD'S BEST INTERESTS THAT THEY SHARE 50/50 PARENTING TIME.
>
> III. IT IS PLAIN ERROR THAT THE DIVORCE TRIAL RE-LITIGATED THE PARTIES' DOMESTIC VIOLENCE CLAIMS THAT WERE PREVIOUSLY ADJUDICATED ON THE MERITS AND UPON WHICH PLAINTIFF PREVAILED.
>
> > A. Defendant's previously adjudicated allegations of domestic violence are barred by claim preclusion (res judicata) and issue preclusion (collateral estoppel).

44

i.    Defendant's marital tort claims are barred by the doctrine of res judicata.

ii.    Defendant's marital tort claims are barred by the doctrine of collateral estoppel.

IV.    THE TRIAL COURT'S FINDINGS OF FACT ARE NOT BASED ON SUBSTANTIAL CREDIBLE EVIDENCE IN THE RECORD AND THEREFORE SHOULD BE GIVEN LITTLE WEIGHT BY THE APPELLATE DIVISION.

We reject plaintiff's arguments in Points I and IV that a change in circumstances was required before the court to adjudicate the custody and removal issues at trial. We also reject the assertion the judge's findings were unsupported by the substantial credible evidence.

> In custody cases, it is well settled that the court's primary consideration is the best interests of the children. . . . The court must focus on the "safety, happiness, physical, mental and moral welfare" of the children. Fantony v. Fantony, 21 N.J. 525, 536 (1956). See also P.T. v. M.S., 325 N.J. Super. 193, 215 (App. Div. 1999) ("In issues of custody and visitation '[t]he question is always what is in the best interests of the children, no matter what the parties have agreed to.'"). . . . Custody issues are resolved using a best interests analysis that gives weight to the factors set forth in N.J.S.A. 9:2-4(c).
>
> [Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) (citations omitted).]

N.J.S.A. 9:2-4(d) states: "The court shall order any custody arrangement which is agreed to by both parents unless it is contrary to the best interests of the child." Otherwise, it must set forth why the agreed-upon arrangement is not in the child's best interests. Ibid.

It is well-settled that a party seeking modification of an existing custody and parenting time arrangement must demonstrate a change in circumstances. Innes v. Carrascosa, 391 N.J. Super. 453, 500 (App. Div. 2007). However, a change in circumstances is required only where a final judgment fixing custody and parenting time has entered. Todd v. Sheridan, 268 N.J. Super. 387, 398 (App. Div. 1993). As a general proposition, in the absence of a final judgment, the Family Part has the authority to revisit and modify pendente lite orders. Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995). This is even more so when the issue in dispute is the custody of a child because the court sits as parens patriae. Fantony, 21 N.J. at 536.

The MOU specifically twice stated the parties understood it was not a contract, yet also stated "it is our desire that the terms be set forth in a final judgment, by which we will be bound . . . ." However, the terms of the MOU were never incorporated into a final judgment and instead were embodied in a pendente lite order.

46

More importantly, as we have recounted, the record is abundantly clear both parties understood custody and removal were trial issues. The MOU and the pendente lite order incorporating it did not address removal. Moreover, we fail to see how the MOU, which considered a change in immigration status worthy of a modification of the holiday schedule, would not also consider a modification of the child's place of residence based on a change in a parent's immigration status as well. Furthermore, the record does not support plaintiff's argument defendant's immigration status was self-created. This argument lacks merit to warrant discussion. R. 2:11-3(e)(1)(E).

Because it was clear defendant was A.S.'s primary caretaker and could not remain in the United States, it was equally clear why the parties' pendente lite custody agreement was not in the child's best interests. Contrary to plaintiff's arguments, the judge did not need to make a more explicit finding on this point pursuant to N.J.S.A. 9:2-4(d).

Plaintiff challenges the judge's findings under the N.J.S.A. 9:2-4(c) factors and argues it "amounted to a rote use of N.J.S.A. 9:2-4(c) as a checklist," which "did not actually focus on the best interests of the child . . . [and] centered on [d]efendant's selfish desire to return to India." He argues the trial judge

applied the <u>Baures v. Lewis</u>, 167 N.J. 91 (2001), standard by focusing on defendant's needs in deciding the removal. We disagree.

The trial judge painstakingly addressed and explained her reasons in deciding the custody and removal by applying the facts to each N.J.S.A. 9:2-4(c) factor. We affirm substantially for the reasons expressed in the judge's thorough oral opinion. Plaintiff's argument the judge's reasoning was rote lacks sufficient merit to warrant further discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

The record also does not support the suggestion the judge applied the <u>Baures</u> standard. The <u>Baures</u> Court predicated removal applications on the premise that "social science research links a positive outcome for children of divorce with the welfare of the primary custodian and the stability and happiness within that newly formed post-divorce household." 167 N.J. 106. As a result, the Court adopted factors for consideration different from the N.J.S.A. 9:2-4(c) factors, namely,

> (1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and

whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new location; (9) if the child is of age, his or her preference; (10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.

[Id. at 116-17.]

The Bisbing Court overturned the holding in Baures stating:

In short, social scientists who have studied the impact of relocation on children following divorce have not reached a consensus. . . . Moreover, the progression in the law toward recognition of a parent of primary residence's presumptive right to relocate with children, anticipated . . . in Baures, has not materialized."

[Bisbing, 230 N.J. at 330.]

Here, there is no evidence the trial judge applied the Baures factors. At the outset, we note the Legislature qualified the list of factors in N.J.S.A. 9:2-4(c) when it stated: "In making an award of custody, the court shall consider but not be limited to the following factors . . . ." (Emphasis added). Plaintiff

49                                                                      A-2233-18

presented evidence to the judge in his case in chief comparing the medical and educational systems in the United States and India. He also adduced evidence relating to the child's relationship with extended family in India. There was also evidence of plaintiff's efforts to stifle defendant's ability to remain in the country, which required the judge to assess her employment prospects and standard of living in India and the United States. Although these considerations may suggest the application of the <u>Baures</u> factors, a thorough review of the record shows the judge adjudicated the custody and removal applying the correct law. Defendant's place of residence, her employment prospects, and other comparisons made by the judge between India and United States were all proper considerations under the N.J.S.A. 9:2-4(c) factors, which require the court to assess among other factors "the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; . . . [and] the parents' employment responsibilities[.]"

In Point II, plaintiff argues it was an error for the court to address custody without the assistance of an expert to evaluate A.S.'s best interests and provide insight to the court, particularly in a case involving an issue of magnitude such as a removal.

We reject plaintiff's argument that an expert was required before the judge could decide custody and removal. This proposition is unsupported by our law. Indeed, neither Rule 5:3-3 nor Rule 5:8-6 require the court to appoint a custody expert nor the parties to retain one. Moreover, although our Supreme Court has stated: "In implementing the 'best-interest-of-the-child' standard, courts rely heavily on the expertise of psychologists and other mental health professionals," Kinsella v. Kinsella, 150 N.J. 276, 318 (1997), there is no evidence mental health was an issue in this case. Here, given the level of preparation and knowledge demonstrated by both parties at trial, there is no evidence plaintiff was incapable of retaining an expert. Moreover, he does not identify the missing "scientific, technical, or other specialized knowledge [that would] assist the [judge] . . . to understand the evidence or to determine a fact in issue." N.J.R.E. 702.

In Point III, plaintiff argues the trial judge was barred by res judicata and collateral estoppel from making a finding of domestic violence because the judge who decided the domestic violence case determined there was none. He asserts the judge's independent findings of domestic violence influenced the outcome of the custody determination and the marital tort finding. He argues the judge prevented him from producing a Jersey City police officer who

testified at the domestic violence trial to testify as a rebuttal witness in the divorce matter. He argues domestic violence was not a consideration because defendant settled custody after any purported domestic violence occurred.

As a result, defendant also argues the marital tort findings were unsupported by the evidence. He asserts we should not defer to the trial judge's fact findings because the judge ignored the credible evidence and several areas of defendant's testimony, which demonstrated she lacked credibility.

The doctrine of res judicata requires:

> (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.
>
> [Rippon v. Smigel, 449 N.J. Super. 344, 367 (App. Div. 2017).]

In order to determine whether the prior action and the later action are the same a court must consider:

> (1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient

to support the first); and (4) whether the material facts alleged are the same.

> [Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 606-07 (2015).]

Collateral estoppel is "a branch of the broader law of res judicata which bars relitigation of any issue actually determined in a prior action generally between the same parties and their privies involving a different claim or cause of action." Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173 (App. Div. 2000) (internal quotations omitted). For collateral estoppel to apply, a party must demonstrate:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Delacruz v. Alfieri, 447 N.J. Super. 1, 24 (Law. Div. 2015) (citing In Re Est. of Dawson, 136 N.J. 1, 20-21 (1994)).]

Here, res judicata and collateral estoppel did not apply because the TRO remained in place during the divorce proceedings following our initial remand and a final judgment in the domestic violence matter was not yet entered. Moreover, as we noted in our decision remanding the domestic violence matter,

the trial judge there only addressed the May 2016 predicate acts and did not address the history of domestic violence. Therefore, even if the findings in the domestic violence case were somehow final, defendant adduced much more testimony regarding the prior history of domestic violence which was not previously adjudicated. Also, plaintiff was convicted following a trial in the municipal court of simple assault for the May 2016 incidents and was fined and served a one day in jail. Although we understand plaintiff appealed the conviction, the record lacks evidence it was overturned.

"Domestic violence is a term of art which describes a pattern of abusive and controlling behavior which injures its victim." Corrente v. Corrente, 281 N.J. Super. 243, 246 (App. Div. 1995). For these reasons, the Legislature created the fourth N.J.S.A. 9:2-4(c) factor, requiring the court to consider "the history of domestic violence, if any[.]" However, the Legislature also adopted the fifth N.J.S.A. 9:2-4(c) factor, which requires the court to consider "the safety of the child and the safety of either parent from physical abuse by the other parent[.]"

Interpreting the statute, as we must, using its plain language, the absence of the term "domestic violence" in the fifth best interests factor signals the trial judge could still consider acts of abuse regardless of whether they constituted a

pattern of abuse or control and qualified as domestic violence. Similarly, the marital tort claim did not share the same characteristics or theory of recovery as the domestic violence for either res judicata or collateral estoppel to apply.

The trial judge did not prevent plaintiff from producing a Jersey City police officer to testify on his behalf. On the first day of trial, plaintiff advised the court he had subpoenaed the officer as his witness, but the officer was on leave and could not testify. On the tenth day of trial, during the presentation of defendant's case in chief, plaintiff announced he wished to produce the officer as a rebuttal witness. By then, the officer had testified in the domestic violence matter and in the municipal court trial leading to plaintiff's conviction.

Contrary to plaintiff's argument on appeal, the trial judge did not foreclose him from producing the witness and instead stated: "I don't know. You are finished with your case in chief. Again, it's almost like giving you a second bite at the apple, but I'll give you an opportunity to think about it. We won't talk about it today." On the thirteenth day of trial, plaintiff presented his rebuttal testimony and evidence, but never called the officer. We discern no error on the judge's part where plaintiff failed to present his subpoenaed witness.

 A-2233-18

III.

In A-3932-18, plaintiff challenges an April 26, 2019 post-judgment order. He argues the order modified the terms of the FJOD, which mandated he have a minimum of six weeks of parenting time in the United States, reducing his parenting time by several weeks by finding the child was to spend seventy five percent of his summer vacation time with plaintiff instead. Plaintiff also asserts the trial judge erred by not finding defendant unilaterally enrolled A.S. in JBCN in order to shorten plaintiff's summer parenting time.

He also alleges the trial judge improperly modified the FJOD by imposing deadlines for the satisfaction of his financial obligations, which were not previously contained in the judgment, thereby exceeding the scope of the court's authority pending appeal. He asserts the judge found he made tactical, manipulative communications during FaceTime calls where there was no such evidence in the record. He also argues the judge made new findings of domestic violence during the marriage beyond the scope of the judge's findings in the divorce trial.

The trial judge's rulings regarding the vacation and the school selection were sound. In her oral findings on January 24, 2019, the judge stated plaintiff's "[p]arenting time will be at a minimum six weeks during the child's vacation,

whatever months that is, starting five days after school, and the child must be returned one day [sic] before school starts."  The judge also stated plaintiff "should be permitted the majority of the child's vacation parenting time" and previously noted the six weeks was "approximately" what plaintiff's parenting time would be according to the Indian school calendar.  In the FJOD, the judge stated: "It is the [c]ourt's intention that Ay[.S.] spend [seventy-five percent] of his summer vacation time with the plaintiff . . . [to] commence [five] days after school closes for the year and Ay[.S.] shall return to India one week prior to the start of the school year."

The April 26, 2019 order reiterated A.S. would spend his summer vacation in the United States with plaintiff from five days after school ends until one week before school starts again.  Therefore, the April 26, 2019 order was in accord with the FJOD and did not constitute a modification.

Furthermore, the record supports the judge's conclusion that plaintiff failed to meet his burden to show defendant selected JBCN in order to shorten his parenting time.  JBCN was the only mutually-agreed-upon school referenced on each party's list of prospective schools for A.S.  Defendant's selection comported with the FJOD, which required the parties to "discuss and agree what school best fits the needs of the child and their ability to pay for same."

57

A-2233-18

A motion to enforce litigant's right is governed by Rule 1:10-3. "Rule 1:10-3 provides a 'means for securing relief and allow[s] for judicial discretion in fashioning relief to litigants when a party does not comply with a judgment or order.'" N. Jersey Media Grp., Inc. v. State Off. of the Governor, 451 N.J. Super. 282, 296 (App. Div. 2017) (quoting In re N.J.A.C. 5:96, 221 N.J. 1, 17-18 (2015)). We review an order entered under Rule 1:10-3 for abuse of discretion. Id. at 299.

Plaintiff's argument the trial judge's imposition of a deadline to meet his financial obligations under the judgment was an improper modification of the judgment pending appeal lacks merit. There was no question plaintiff violated his court ordered obligation to pay defendant the sums owed to her. The judge's imposition of a deadline to satisfy the money judgments was well within her discretion and power to enforce the FJOD.

However, we are constrained to vacate and remand the portion of the April 26, 2019 order stating:

> Plaintiff shall cease all tactical and manipulative communications during Face[T]ime videocall sessions and phone-calls with the parties' child in on-going attempts to harm the safety of the parties' child and negatively influence the parties' child against the [d]efendant and [d]efendant's family, pursuant to the [c]hild's relocation to India with the [d]efendant.

Although each party presented evidence and argument to the trial judge blaming the other for interfering with the FaceTime calls, the record lacks findings by the judge that plaintiff was the culprit. We vacate and remand this portion of the order for further findings by the judge.

Plaintiff argues the judge's findings of domestic violence from the divorce trial only addressed the incidents which occurred in May 2016 and did not include specific findings of domestic violence in 2012. He asserts the April 26, 2019 order made new findings regarding incidents of domestic violence in 2012, which constituted an improper modification of the FJOD pending appeal.

The evidence presented in the divorce trial included the 2012 incidents. As we noted, the judge's oral findings of fact prior to entering the FJOD concluded there were incidents of domestic violence between January and July 2012. The judge found the domestic violence was predicated on a series of acts "from the inception of the parties' marriage beginning in early 2012 until the day of their final separation on May 31st, 2016." This argument lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

IV.

In A-1982-19, plaintiff challenges December 6, 2019 and January 15, 2020 orders and raises the following points for our consideration:

POINT I

THE TRIAL COURT'S FINDINGS OF ENTERING
SANCTIONS AGAINST PLAINTIFF WERE
IMPROPER AND MUST BE REVERSED.

POINT II

THE TRIAL COURT NOT FINDING . . . PLAINTIFF
BEING CURRENT ON CHILD SUPPORT WAS
IMPROPER AND MUST BE REVERSED.

POINT III

THE TRIAL COURT'S ENTRY OF
"REPRIMANDING" PLAINTIFF IN ITS ORDER IS
IN CONTRADICTION TO ITS OWN FINDINGS ON
THE RECORD, CONSTITUTES AN ABUSE OF
DISCRETION AND MUST BE REVERSED.

POINT IV

THE TRIAL COURT'S FINDINGS AND ASSESSING
PLAINTIFF 100% OF THE [CHILD'S] TRAVEL
COSTS CONSTITUTES AN ABUSE OF
DISCRETION AND MUST BE REVERSED.

POINT V

THE TRIAL COURT'S VARIOUS FINDINGS RE:
THE [CHILD'S] BEST INTERESTS, IN LIGHT OF
DEFENDANT'S CONDUCT AS IT PERTAINS TO
THE JANUARY 24, 2019 DECISION WERE
IMPROPER AND MUST BE REVERSED.

POINT VI

THE TRIAL COURT'S VACATING PRIOR ORDERS ALREADY UNDER THE UMBRELLA OF THE PENDING APPEAL CONSTITUTE AN ABUSE IN [DISCRETION] AND MUST BE REVERSED.

In Point I, plaintiff argues the judge contradicted herself because during oral argument she stated she would not sanction either party, yet in her written order she sanctioned only him.

Defendant's motion asked the court to sanction plaintiff for failing to meet his financial obligations pursuant to the January 24 and April 26, 2019 judgment and order, respectively. Conversely, plaintiff's motion sought to sanction defendant for "demanding school fees in excess of [p]laintiff's [o]rdered share of [the c]hild's tuition fees." The judge granted defendant's requests for sanctions and denied plaintiff's request. Notably, the order did not issue an actual sanction aside from granting enforcement of the FJOD and order setting forth plaintiff's financial obligations.

In her oral findings the judge found plaintiff in violation of litigant's rights, but made no affirmative findings she would also sanction either party, and instead stated: "I'm going down the order [which requests the court] issue sanctions and, again, I'm reserving on that for now." Therefore, the judge did not contradict herself because the issue was reserved. However, the written orders lack an explanation of the reason for the sanctions or the nature of the

61

sanction itself and whether it was just to find plaintiff in violation of litigant's rights. For these reasons, we are constrained to reverse and remand for further findings regarding the imposition of sanctions.

In Point II, plaintiff asserts the judge erred when she failed to find he was current on child support and asserts the decision is contrary to the evidence and the judge's statements during the motion hearing. This issue is moot. The December 6, 2019 order states: "O[rdered] that [p]laintiff is current on his child support obligations being paid to [d]efendant in the amount of $253/week[.]"

In Point III, plaintiff argues the trial judge contradicted herself when "during oral arguments at the motion hearing on December 6, 2019, [she] state[d] that ' . . . [t]he . . . [c]ourt doesn't reprimand . . . [,]' yet it goes on to enter relief to the contrary when it grants relief sought by [d]efendant to '[r]eprimand [p]laintiff[.]" Plaintiff misreads the record.

Because each party made numerous requests for relief, during the motion hearing the judge utilized their respective forms of order to discuss the requests she was inclined to grant. In pertinent part, defendant's form of order read as follows:

> 7. Reprimanding and [c]ompelling [p]laintiff to stop demanding [d]efendant to work with QDRO agencies for the QDRO and liquidation of [p]laintiff's 401([k]) account through [p]laintiff's employer, which is

pending for approximately three . . . years now since the [c]ourt [o]rder of March 30, 2017.

. . . .

9. Reprimanding [p]laintiff on awarding himself with [c]ounsel [f]ees and [c]osts in the amount of $178.00 for the [order to show cause] dated May 16, 2019, absent any [c]ourt [o]rder. Plaintiff is hereby [o]rdered to refrain from making inappropriate and unauthorized deductions in an attempt to reduce his share of the aforementioned pending financial relief owed to the [d]efendant.

During the motion hearing, the judge explained "the [c]ourt doesn't reprimand, and I know that that's just a term of art, but I am going to grant especially [n]umber [seven.]" Regarding paragraph nine, the judge stated: "Again, absent any court order [plaintiff] is hereby refrained from making inappropriate and unauthorized deductions, that's correct, in an attempt to reduce his share. So, I have granted that. I didn't make any awards."

The written order modified paragraph seven of defendant's form of order as follows:

7. . . . ~~Reprimanding and [c]ompelling [p]laintiff to stop demanding~~ Plaintiff + [d]efendant to work with QDRO agencies for the QDRO and ~~liquidation~~ of [p]laintiff's 401([k]) account through [p]laintiff's employer~~which is pending for approximately three . . . years now since the [c]ourt [o]rder of March 30, 2017~~.

The order did not change the language in paragraph nine.

63

We are unconvinced the trial judge erred. She did not contradict herself because consistent with her oral findings, she struck the language referring to a reprimand in paragraph seven. Moreover, the reference to a reprimand in paragraph nine did not amount to an abuse of discretion because the paragraph explained plaintiff was "refrain[ed]" from exercising self-help by taking unilateral deductions against the monetary obligations he repeatedly refused to pay. The record clearly supports the decision to grant this relief.

In Point IV, plaintiff argues the court found him "100% responsible [for A.S.'s] ticket . . . change penalties . . . in paragraph [two] of the January 15, 2020[, o]rder[.]" He asserts the court modified the judgment, which required the parties to equally bear A.S.'s travel costs. Plaintiff reiterates he bought a ticket for A.S. to visit him in the United States on May 15, 2019, however, defendant failed to put the child on the plane and left plaintiff's mother waiting at the airport. As a result, plaintiff had to rebook the tickets for A.S. and plaintiff's mother for May 17, 2019, with a return date of June 6, 2019. Plaintiff states the judge abused her discretion because during the motion hearing she found defendant at fault for not boarding the child onto the plane.

The FJOD requires the parties to share equally in the child's plane fare to have parenting time with plaintiff. During the motion hearing, the judge

addressed the requests sought in plaintiff's form of order and stated: "Next is [fifty] percent of the airline ticket, again, that was the 2019 ticket that was used, for lack of a better word, seeking $847.  The [c]ourt will grant that[.]"  Separate from the airfare, the judge reserved decision regarding the date change penalties subject to her review of plaintiff's bank statements proving he incurred the expense.

After reviewing the evidence submitted by plaintiff, the judge issued the January 15, 2020 order and written findings reversing her decision.  The judge noted, plaintiff's proofs showed he incurred $3126.42 and was refunded $2050.31, leaving $1076.11 representing the no-show penalties.  Plaintiff then re-booked tickets for A.S. and the paternal grandmother at a cost of $3388.77.  The judge stated: "The date change fee of $932.60 'clearly shown in . . . [plaintiff's] bank statement, posted on June 12, 2019[.'] This is the exact same amount as on the . . . date change penalty receipt provided in motion exhibits."

Because of the pending appeals, the judge concluded she could not consider any request for reimbursement of travel costs and penalties associated with the paternal grandmother.  The judge reasoned the judgment only addressed the airfare for A.S. and therefore expanding it to include costs for the

grandmother would not constitute enforcement, but modification. This determination was not an abuse of discretion.

The judge also concluded plaintiff's "submissions with respect to the no-show costs for Ay[.S.]'s ticket does not allow the [c]ourt to make the necessary determination as to the reimbursement amount" because the proofs submitted failed to include a "breakdown of the original cost of only Ay[.S.]'s ticket. Additionally, the refund processed email from [the online travel agent] does not provide a breakdown by way of individual." However, the judge was able to determine the change of date fees attributable to A.S., which she calculated as $466.30 representing one-half of $932.60 plaintiff incurred.

The judge concluded as follows:

> From the proofs offered the [c]ourt does not find [plaintiff] has demonstrated by a preponderance of the credible evidence that [defendant] gave inaccurate information as to the date Ay[.S.'s] new school would re-open from summer vacation. From the submissions provided the [c]ourt does not find [defendant] intentionally misled either the [c]ourt or [plaintiff] about the opening date of Ay[.S.'s] school [JBCN]. Indeed, a review of the paperwork submitted and the portion of the [c]ourt hearing on April 26, 2019 reveals that [defendant] offered mid-June as the start date of school. A copy of the transcript provided for the April 26[] hearing reveals it was [plaintiff] who gave exact dates during the hearing[,] offering that he had a school calendar.

66

. . . Indeed, it was [plaintiff] who insisted at various times during the April 26, 2019 hearing, that school started either June 10 or June 3, 2019. The [c]ourt ordered the parties to follow the [o]rder of the [c]ourt— namely vacation was to start [five] days after school closes and the return of the child was to take place one week before the start of school. The [c]ourt gave no exact dates.

. . . The fact that plaintiff thereafter purchased tickets for a return date which was incorrect, without more, does not provide a basis for a finding that it was [defendant] who misled the [c]ourt and [p]laintiff and therefore she should be responsible for A[.S.]'s change of date fees.

. . . If [plaintiff] can obtain proof of the breakdowns of A.[S.'s] ticket costs [minus] reimbursement costs, he may refile his application. The [c]ourt cannot, however, find . . . that [defendant] is responsible for [$1076.11] for no show fees, given this includes costs for [plaintiff's] mother as well.

The judge's findings were supported by the substantial credible evidence and were not an abuse of discretion. We decline to disturb her ruling.

In Point V, plaintiff argues defendant violated the April 26, 2019 order by failing to bring A.S. to the airport on May 16, 2019, and "refus[ing] to permit . . . A.S., to visit [p]laintiff in the [United States] during his Diwali vacation [from] school [in] October-November 2019[.]" He asserts defendant failed to create a schedule for A.S. to visit his paternal grandparents in India and is intentionally depriving A.S. from seeing them. He points out although the court

67

did not address the grandparent visitation, it was a factor the court considered in allowing defendant to relocate to India with A.S. Plaintiff also repeats arguments he made regarding the FaceTime calls, namely, that defendant and other adults were in the same room as A.S. and defendant employed "harassing tactics during FaceTime calls designed to impede [p]laintiff's ability to have a quality relationship with his son." Plaintiff argues the court erred by not finding defendant in violation of litigant's rights and ignored A.S.'s bests interests when it did not grant these requests in his motion.

The December 6, 2019 order addressed the summer 2019 vacation costs by awarding plaintiff $847 representing one-half of the ticket cost and permitting him to offset "this amount by reducing $847 from the monies owed by [p]laintiff to [d]efendant." As we noted, the judge's findings respecting the other costs associated with the trip were unassailable.

The December 6 order also granted plaintiff's request to find "defendant in violation of [the court's] prior orders by refusing to honor [plaintiff's] various requests to allow . . . [A.S.] to visit [p]laintiff in the United States for [two] weeks, during his . . . Diwali school break . . . in 2019." Therefore, this issue is moot.

Plaintiff's argument relating to grandparent visitation lacks merit and is affirmed substantially for the reasons expressed by the trial judge. We add the following comments. Grandparent visitation rights are governed by N.J.S.A. 9:2-7.1. Our Supreme Court has explained that because parents have a fundamental right of autonomy to parent their children, a party seeking grandparent visitation must first "prove that visitation is necessary to avoid harm to the child." Moriarty v. Bradt, 177 N.J. 84, 117 (2003). Only when the movant meets his or her burden of overcoming the presumption in favor of the parent by a preponderance of the evidence is the court then required to determine a visitation schedule that is in the best interests of the child. Ibid.

Here, no complaint for grandparent visitation was ever filed. Moreover, as noted by the trial judge, the record here is devoid of an any evidence demonstrating plaintiff met his burden of proof under Moriarty.

We also decline to disturb the judge's findings regarding the FaceTime calls. We recounted the detailed findings the judge made after she "watched hours and hours['] worth of video of Ay[.S.] and [plaintiff] during their FaceTime" and concluded she could find none of the violations or adverse conduct allegedly perpetrated by defendant. Plaintiff's appendix lacks the videos he provided to the trial judge. See R. 2:6-1(a)(1)(I) (appellant's appendix

must include those portions of the record that "are essential to the proper consideration of the issues").  However, a review of still photos of the FaceTime calls provided by plaintiff only reveal a few photos in which there is another person in the room with A.S. and do not convince us the judge's findings were mistaken.

In Point VI, plaintiff alleges the court's January 24, 2019 custody determination and conclusions regarding defendant's inability to remain in the United States "failed to give any weight to [d]efendant's failure to undertake efforts to remain in the U[nited] S[tates]" and ignored a "self-created 'deportation situation'".  He asserts defendant's immigration status should not have served as a basis for a modification of custody agreement and "she is unable to demonstrate that the best interests of [A.S.] would be served by a relocation to India."  Plaintiff repeats his argument "[a] best interests analysis is not required where the parties have reached an agreement as to custody and parenting time" and the parties had already agreed to equal custody of A.S.  He further asserts defendant raised no claims of domestic violence after the parties entered into the custody and parenting time agreement.  Therefore, the existence of domestic violence was not a basis to modify the agreement.  He concludes by claiming

the [t]rial [c]ourt['s] attempts of now vacating [the July 21, 2017] [o]rder, more than a year after its oral decision on January 24, 2019[,] are improper in light of the pending appeal and beyond the scope of the [t]rial [c]ourt['s] jurisdiction . . . . The [t]rial [c]ourt['s] finding and [o]rdering that the "FJOD Court Order of 1/24/2019 supersedes all prior pendente-lite [c]ourt [o]rders from before the trial proceedings," made by the [t]rial [c]ourt in paragraph [sixteen] of the December 6, 2019 [o]rder . . . is hence improper and must be reversed because this is a new finding which is not enforcement of its January 24, 2019 oral decision of the [FJOD], and this finding is beyond the scope of amplification of the [t]rial [c]ourt's decision, in light of the pending appeals . . . . Rule 2:9-1 provides that the [t]rial [c]ourt shall have continuing jurisdiction to enforce judgments and orders pending appeal. The [t]rial [c]ourt is therefore barred from making any new findings in the December 6, 2019 [o]rder which it had failed to previously make in its January 24, 2019 oral decision of the [FJOD], and as such any such findings must all be reversed since they constitute an abuse in discretion by the [t]rial [c]ourt.

We have addressed the arguments relating to defendant's immigration status, the removal, the effect of the MOU and pendente lite order incorporating it, and the domestic violence findings at length in section II of this opinion. To the extent that we have not further elaborated on plaintiff's arguments it is because they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Finally, plaintiff raised an issue for the first time in his reply brief and during the oral argument of this appeal, namely, that the January 15, 2020 order

requires him to pay seventy percent of the JBCN tuition whereas the judgment stated he would bear sixty-four percent of the expense. We have stated: "Raising an issue for the first time in a reply brief is improper." Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001). This is because neither the trial judge nor the parties on appeal have had the opportunity to address the argument. Ibid. This is the case here. For these reasons, we decline to address plaintiff's argument as to the percentage of the JBCN fees awarded in the court's January 15, 2020 order.

V.

Affirmed as to A-2233-18. Affirmed in part and vacated and remanded in part as to A-3932-19. Affirmed in part and remanded in part as to A-1982-19.[4] We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] Following oral argument, plaintiff filed a motion to supplement the record under this docket number, which we have denied.